# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT RITCHIE,<br><br>       Plaintiff,<br><br>       v.<br><br>JANET A. NAPOLITANO,<br><br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)     Civil Action No. 13-cv-953 (TSC)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

Plaintiff Scott Ritchie brings suit under (i) Title VII of the Civil Rights Act of 1964

("Title VII") for race discrimination; (ii) Title VII for gender discrimination; and (iii) the Age

Discrimination in Employment Act (the "ADEA") for age discrimination.  (Compl. ¶¶ 25-33).

Ritchie, an unassigned officer within the White House Branch of the Secret Service's Uniformed

Division, alleges that he was discriminated against in being passed over for an assignment to the

Uniformed Division's Counter-Surveillance Unit.

Defendant Janet Napolitano, Secretary of the United States Department of Homeland

Security at the time the complaint was filed, is sued only in her official capacity.[1]  The Secret

Service (the "Service") has moved for summary judgment on all three of Ritchie's claims.

Having considered the Service's motion, Ritchie's opposition thereto, the Service's reply

in support thereof, and the parties' arguments at the January 4, 2016 motion hearing, and for the

---

[1] Given the well-established principle that a suit against a public official in her official capacity "is not a suit against the official but rather is a suit against the official's office," *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citation omitted), and "because the United States Secret Service is an agency within the Department of Homeland Security" (Compl. ¶ 3), this Memorandum Opinion will refer to the Secret Service as the sole Defendant in this action.

reasons set forth below, the Service's motion for summary judgment is hereby **GRANTED** with regard to Ritchie's ADEA claim, and **DENIED** with regard to Ritchie's two Title VII claims.

## I.       FACTUAL BACKGROUND

During the time period relevant to this case, Ritchie was a 43-year-old white male unassigned officer in the White House Branch of the Service's Uniformed Division (the "Division").  (Compl. ¶ 12).  As an unassigned Division officer, Ritchie's assignment and location varied from day to day.  (Opp'n at 2).  He primarily performed fairly monotonous tasks such as standing post at White House complex access points, screening individuals entering the White House complex, answering visitors' questions, and walking the White House fence line. (*Id.* at 2-3).  He had very little control over his work, had to wear a uniform, and was often required to remain in place for hours at a time.  (*Id.* at 3).  He was also in a first-line defense position at the White House, and therefore faced some risk of attack while on the job.  (*Id.*).

In March 2012, White House Branch Deputy Chief Mark Chaney posted a memorandum for six job openings in the Division's Counter-Surveillance Unit (the "Unit"), a plainclothes unit that conducts undercover counter-surveillance in and around the White House complex.  (Mot. at 2-4; Opp'n at 5, 8).  While an assignment with the Unit does not entail higher pay than other Division assignments, it offers a broader range of experience and job responsibilities than an unassigned position.  (Opp'n at 5-7).  At the time the job memorandum was posted, only eight Division officers were assigned to the Unit – all were men, at least six were white, and all were under 35 years old.  (Mot. at 13; Opp'n at 7).

The job memorandum required that applicants have both 18 months of experience as a Division officer and "vulnerabilities" training; no other specific qualifications or skills were identified.  (Opp'n at 8).  For each of four Division shifts, applicants for the Unit positions were directed to submit their résumés to the Watch Commander overseeing their particular shift.  (*Id.*

at 8-9).  The Watch Commanders were to then send the applications to Chaney, writing

recommendations for the applicants they "highly recommended" and ranking them in order of

preference.  (*Id.* at 8).

Approximately fifty "highly recommended" officers across all four shifts applied for the

six Unit positions, including Ritchie.  (Mot. at 5; Opp'n at 9).  Captain Michael Laury, the Watch

Commander for Ritchie's shift, ranked Ritchie at the top of his list of eleven "highly

recommended" applicants.  (Opp'n at 9).  Despite this, Ritchie was not selected for the Unit.

(*Id.*).  Instead, Chaney selected two white women, one black woman, one black man, one

Hispanic man and one 27-year-old white man.  (*Id.* at 9-10).  Two of the six selected applicants

(the black woman and the Hispanic man) were ranked below Ritchie on Laury's list, and one (the

Hispanic man) was also ranked below two other white men on Laury's list who were not

selected.  (*Id.* at 9).

In April 2012, Ritchie filed a discrimination complaint with the Service's EEO Office

regarding his non-selection for the Unit.  (*Id.* at 10).  Pursuant to federal regulations, EEO

counselor Kathy Brezina was assigned to attempt to informally resolve the complaint prior to a

formal EEO investigation.  (Sanctions Opp'n at 3-4).  Brezina interviewed Chaney for about an

hour, taking notes that she then used to create her EEO Counseling Report.  (Sanctions Mot.

at 4-5).  After completing her Report, Brezina destroyed her interview notes pursuant to the EEO

Office's policy that all such notes be destroyed after they are used to create an EEO Counseling

Report.  (*Id.* at 5).

Brezina wrote in her Report, under the heading "Management Official's Statement," that

Chaney had told her that he did not select Ritchie because, "[d]ue to the nature of the [Unit's]

core responsibilities, it is imperative that [Unit officers] be physically and ethnically diverse as

they must assimilate into the environment surrounding the White House Complex," and because

the shift for which Ritchie was applying "did not require individuals physically similar to" him.

(Opp'n Ex. H at 000027).  Brezina also left Ritchie a voicemail in which she stated as follows:

> Good afternoon, Officer Ritchie. It's Kathy Brezina from the EEO Office calling and I just wanted to touch base with you and let you know that I finished the preliminary fact finding for your, um, informal complaint and I was not able to discover any information that supports the claim of discrimination.  Um, what I did was ***I talked to management officials[2] and what they said was that the -- the reason that they selected the people that they selected for the most current, um, [Unit] assignment is they needed a -- a diverse, um, group of people, physically diverse, um, and they selected a black female because they said they had, um, you know, other white males on the unit already*** so -- but they did say that you came highly recommended and it's not saying that you won't ever get the position because you probably will; it's just at this time -- ***at this time, um, they needed a more physically, um, diverse, um, group of people.***

(Opp'n at 11) (emphasis added).

In her deposition, however, Brezina contradicted her EEO Counseling Report and voicemail, stating that (i) Chaney told her "that he selected the individuals that he felt were the best qualified to fill the vacancies"; (ii) Chaney did not tell her that he did not select Ritchie because the Unit already had "enough white males"; and (iii) she did not recall saying that Ritchie was not chosen because the Unit already had "enough white males."  (Mot. at 30; Opp'n at 11).

Chaney acknowledged in his deposition that Ritchie was a "very, very strong candidate" for the Unit.  (Opp'n at 13).  Chaney also stated that while he considered the candidates' races and genders in deciding who to select (Mot. at 13-16; Opp'n at 12, 16 n.6), he ultimately based his selections on skills the six chosen applicants possessed that Ritchie did not.  (Mot. at 7-13; Opp'n at 11-12).  Chaney also stated that being diverse was not mandatory for selection, and that

---

[2] There is no dispute that Chaney was the only "management official[]" with whom Brezina spoke.  (*See* Opp'n Ex. H at 000023 (listing Chaney as the only "Management Official" with whom Brezina spoke during the EEO Counseling Inquiry)).

he would have selected the same six individuals for the Unit regardless of their race or gender

because, based on their other qualifications, they were the six best people for the job.  (Mot. at

15-16).[3]

## II.      THE APPLICABLE LEGAL STANDARDS

### a.   Summary Judgment

Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine*

issue of *material* fact.") (emphasis in original); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir.

2006).  Summary judgment may be rendered on a "claim or defense . . . or [a] part of each claim

or defense."  Fed. R. Civ. P. 56(a).

"A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).

"A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law;

factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment

determination.  An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.'"  *Holcomb*, 433 F.3d at 895 (quoting *Anderson*, 477 U.S. at

248) (citation omitted).  The party seeking summary judgment "bears the heavy burden of

---

[3] The Service also acknowledges that Chaney considered race and gender alongside other considerations, but argues that considering race and gender was permissible, and that even if he had not considered race and gender, Chaney would have still selected the same six people.  (Mot. at 13-16).

establishing that the merits of his case are so clear that expedited action is justified." *Taxpayers*

*Watchdog, Inc., v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987) (citing *Walker v. Washington*,

627 F.2d 541, 545 (D.C. Cir. 1980).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to

be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at

255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *see also Mastro v.*

*Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006) ("We view the evidence in the

light most favorable to the nonmoving party and draw all reasonable inferences in its favor.")

(citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000)).  The nonmoving

party's opposition, however, must consist of more than mere unsupported allegations or denials,

and must be supported by affidavits, declarations, or other competent evidence setting forth

specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp.*

*v. Catrett,* 477 U.S. 317, 324 (1986).  The non-movant is "required to provide evidence that

would permit a reasonable jury to find" in his or her favor.  *Laningham v. U.S. Navy*, 813 F.2d

1236, 1242 (D.C. Cir. 1987) (citations omitted).

b.  Title VII

Congress enacted Title VII of the Civil Rights Act of 1964 to implement "the federal

policy of prohibiting wrongful discrimination in the Nation's workplaces." *Univ. of Tex. Sw.*

*Med. Ctr. v. Nassar*, ─── U.S. ───, 133 S. Ct. 2517, 2522 (2013).  Title VII's anti-discrimination

provision makes it unlawful for an employer "to discriminate against any individual with respect

to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Under

Title VII, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered

an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or]

national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (citations omitted).

### c. The ADEA

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to . . . otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "Courts traditionally apply the same approach to age-discrimination claims under the ADEA as that applied to gender or race claims under Title VII." *Allard v. Holder*, 840 F. Supp. 2d 269, 274 (D.D.C. 2012) (citation omitted). Thus, under the ADEA, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . age." *Baloch*, 550 F.3d at 1196 (citations omitted).

## III.   DISCUSSION

Under Title VII, a plaintiff must demonstrate by a preponderance of the evidence that the adverse employment action taken by his employer was "more likely than not based on the consideration of impermissible factors" such as, *inter alia*, race or gender. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981) (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978)). In so doing, "the plaintiff may prove his claim with direct evidence, and absent direct evidence, he may indirectly prove discrimination" using circumstantial evidence under the familiar burden-shifting analysis created in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 18 (D.D.C. 2009). The analysis under the ADEA is the same with respect to discrimination based on age. *See Beeck v. Fed. Express Corp.*, 81 F. Supp. 2d 48, 53 (D.D.C. 2000) ("A plaintiff suing under the ADEA may establish his claim of discrimination by either direct evidence of discriminatory intent or

circumstantially by using the familiar burden-shifting scheme announced in *McDonnell Douglas Corp. v. Green*.").

     "Adverse employment actions are not confined to hirings, firings, promotions, or other discrete incidents." *Holcomb*, 433 F.3d at 902 (D.C. Cir. 2006) (citing *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000)).  A plaintiff who is denied a lateral transfer – *i.e.*, a transfer in which the plaintiff suffers no diminution in pay or benefits – "does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999), *abrogated on other grounds by Steele v. Schafer*, 535 F.3d 689 (D.C. Cir. 2008).  However, the mere fact that an employee wanted a particular assignment is not enough to make that employee's non-selection for that assignment a materially adverse employment action.  *See Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 308 (D.D.C. 2005) ("[Plaintiff] contends that she 'would have liked to have worked' in the General Counsel's Office (where this position was), and that the [position] would have been 'very appropriate for one with [her] background.'  However, '[m]ere idiosyncrasies of personal preference are not sufficient to state an injury.'") (quoting *Brody*, 199 F.3d at 457).

     "Direct evidence of discriminatory intent alone is sufficient to survive summary judgment." *Robinson v. Red Coats, Inc.*, 31 F. Supp. 3d 201, 216 (D.D.C. 2014) (citing *Stone v. Landis Constr. Corp.*, 442 F. App'x 568, 569 (D.C. Cir. 2011) (per curiam)).  Thus, "a statement that itself shows racial or gender bias in the [adverse employment] decision . . . would generally entitle a plaintiff to a jury trial." *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011).  "While courts have not precisely defined what constitutes direct evidence, it is clear that at a minimum, direct evidence does not include stray remarks in the workplace, particularly those

made by nondecision-makers or statements made by decisionmakers unrelated to the decisional process itself." *Hajjar–Nejad v. George Wash. Univ.*, 37 F. Supp. 3d 90, 125 (D.D.C. 2014) (citation and quotations omitted).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by providing proof of "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002) (citations omitted).  If the plaintiff establishes a *prima facie* case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  *McDonnell Douglas*, 411 U.S. at 802.

"If the [employer] satisfies that burden, the *McDonnell Douglas* framework – with its presumptions and burdens – disappears, and the sole remaining issue is discrimination *vel non*." *Waterhouse v. D.C.*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quotation, citation and alterations omitted).  At that point, a court "need resolve only one question: 'Has the employee produced sufficient evidence for a reasonable [factfinder] to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis' of his or her protected status?"  *Smith v. Napolitano*, 626 F. Supp. 2d 81, 88-89 (D.D.C. 2009) (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)) (alteration removed); *see also Chappell-Johnson v. Bair*, 574 F. Supp. 2d 103, 106 (D.D.C. 2008), *aff'd*, 358 Fed. App'x 202 (D.C. Cir. 2009) (observing that the principles articulated in *Brady* also apply in the ADEA context).

In order to demonstrate that a reasonable jury could conclude that he or she was terminated for a discriminatory reason, a plaintiff "must prove that a reasonable jury could infer that the employer's given explanation was pretextual and that this pretext shielded discriminatory

motives." *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007) (citing *Murray v. Gilmore*,

406 F.3d 708, 713 (D.C. Cir. 2005)).  The question thus becomes

> whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer.

*Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998).

### a. Ritchie Has Proffered Evidence That Would Permit A Reasonable Jury To Find That His Non-Selection For The Unit Constituted An Adverse Employment Action

The D.C. Circuit has made clear that "[w]hether a particular reassignment of duties

constitutes an adverse action . . . is generally a jury question," and has stated that a district court

"may not take that question away from the jury if a reasonable juror could find that the

reassignment left the plaintiff with significantly diminished responsibilities." *Czekalski v.

Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007) (citations omitted) (concluding that a jury could find

adversity where, after a lateral transfer, plaintiff supervised fewer employees and managed a

smaller budget); *see also Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010)

(noting that "the fact-finder must compare the position[s]" at issue); *Evans v. D.C.*, 754 F. Supp.

2d 30, 47 (D.D.C. 2010) ("it is for a jury to decide whether plaintiff's diminished duties and

responsibilities rose to the level of an adverse employment action").

Applicable case law also makes clear that a plaintiff's **non-selection** for a lateral transfer

or assignment constitutes a materially adverse employment action where such transfer or

assignment would have brought with it increased responsibilities and/or increased promotion or

future employment opportunities.  *See, e.g.*, *Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir.

2003) (finding adverse employment action where plaintiff was denied the opportunity to transfer

to his supervisor's position, which had the same pay and benefits as his present position, because

denial of transfer to position "with substantially greater supervisory authority . . . had materially adverse consequences for his present and future employment opportunities"); *Brody*, 199 F.3d at 457 ("A plaintiff who is made to undertake or who is denied a lateral transfer . . . does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm."); *Adams v. Mineta*, No. 04-cv-856(RBW), 2006 WL 367895, at *7 (D.D.C. Feb. 16, 2006) (stating that although the position at issue would not have entitled the plaintiff to additional pay or benefits, failure to select the plaintiff "for a position that had significantly different and heightened job responsibilities, along with additional supervisory functions, amounted to materially adverse consequences affecting the terms, conditions, or privileges of her employment such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm") (citations, quotations and alterations omitted).

In the instant case, the Service argues that Ritchie's non-selection for the Unit assignment did not constitute an adverse employment action because, among other reasons, the Unit assignment "was not a new job, but simply a different assignment that included no additional pay," and would not provide better opportunities for promotion. (Mot. at 33-34). The court finds, however, that a reasonable jury could conclude that Ritchie's non-selection was an adverse employment action because a Unit position would have been safer than Ritchie's unassigned Division position, and would have provided significantly better responsibilities and employment opportunities (including greater potential for promotion) compared to his unassigned position.

For example, Ritchie has proffered evidence that:

- Unit positions are safer than unassigned Division positions because unassigned officers "wear Secret Service uniforms and can be stationed in high-profile, high-exposure positions on the perimeter of the White House

complex," whereas Unit officers are not perceived as being associated with the Service due to the nature of their undercover work, and are often located outside of the White House complex (Opp'n at 30);

- As an unassigned Division officer, Ritchie performs monotonous tasks, has little opportunity to develop new skills and has little freedom to move about, eat or control his work or the manner in which he conducts himself (*id.* at 28-29), whereas Unit officers "engage in varied and exciting work that allows them to develop new skills" (such as "work[ing] undercover in plainclothes, gathering intelligence and conducting counter surveillance around the White House complex"), with "far more flexibility to walk around, interact with visitors to the White House Complex, eat, and generally determine the best method of accomplishing their task" (*id.* at 29);

- Unit officers receive on-the-job training in counter-surveillance and counter-intelligence work that unassigned Division officers do not receive (*id.* at 31);

- Unit officers have better opportunities for promotion than unassigned Division officers because promotions within the Division depend in part on an officer's performance on the "Knowledge, Skills, and Abilities" ("KSA") assessment, and "the more exposure a [Division] officer has to different situations and skills" – like those to which Unit officers are exposed – "the more likel[y] he or she [is to] receive a good KSA score," and thus, a promotion (*id.* at 32);[4] and

---

[4] The Service points out that only one Unit officer (who, at the time of briefing, had not yet been promoted) has received the minimum promotion score since April 2011, while 98 Division officers have received the minimum promotion score since November 2013, 23 of whom have actually been promoted. (Reply at 14). This is a misleading comparison, however, because there are hundreds of Division officers in many different assignments (including "preferred assignments" other than the Unit) and only a small handful of Unit officers. The apt comparison would be between the per capita promotion rate of unassigned Division officers (like Ritchie) and that of Unit officers.

The Service also argues that "the criteria used for promotion of [Division officers] is spelled out in the Service's 'Merit Promotion Plan for Uniformed Division Positions,' and experience with the [Unit] or any other 'preferred assignment' is not listed amongst the promotion criteria to be used." (*Id.*) (citation omitted). But Ritchie's argument is more nuanced than the Service acknowledges. Ritchie contends that, to get a promotion, Division officers must complete a form detailing their knowledge, skills and abilities, which is then used to determine their "promotion potential score," and that assignment to the Unit allows an officer to obtain a higher promotion potential score because it allows officers to better develop their knowledge, skills and abilities. (Opp'n at 3, 32) (citation omitted). This argument is supported by the evidence, and the Service does not appear to have any meaningful response to it.

- Unit positions are highly sought after, as evidenced by the highly competitive selection process detailed by Chaney, in which approximately fifty "highly recommended" Division officers applied for six Unit positions (*see id.* at 30).

The court therefore finds that Ritchie's contention that the Unit detail is safer and provides greater opportunities for advancement constitutes more than mere speculation, and that there is sufficient evidence to demonstrate that his non-selection for the Unit assignment "affect[ed] the terms, conditions, or privileges of [his] employment or [his] future employment opportunities such that a reasonable trier of fact could conclude that [he] has suffered objectively tangible harm." *Brody*, 199 F.3d at 457.

     b.  Ritchie Has Proffered Direct Evidence That Would Permit A Reasonable
          Jury To Find That He Was The Victim Of Race And Gender Discrimination

Ritchie cites to Brezina's EEO Counseling Report and voicemail as "overwhelming direct evidence that Chaney did not select Ritchie for the [Unit] position because of his race and gender." (Opp'n at 15). Specifically, Ritchie states that Brezina "interviewed Chaney . . . about his selection decision," and that her Report "indicates that Chaney told Brezina that he did not select Ritchie because he 'did not require individuals physically similar to' Ritchie." (*Id.*) Ritchie also states that Brezina left him a voicemail "in which she stated that she spoke with Chaney and that he informed her that he made selections on the basis of physical diversity and that he did not select Ritchie because they 'had white males on the unit already.'" (*Id.* at 15-16).

The Service argues that Brezina's Report and voicemail are inadmissible hearsay, and therefore cannot be considered as direct evidence of discrimination. (*See* Mot. at 29-31; Reply at 9-11) (each citing, *inter alia*, *Manuel v. Potter*, 685 F. Supp. 2d 46, 58 (D.D.C. 2010) ("[T]he non-moving party cannot rely upon inadmissible evidence to survive summary judgment; rather, the non-moving party must rely on evidence that would arguably be admissible at trial.") (citing *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007)). The Service contends that Brezina

"was not part of the decision making process," had the limited role of "gather[ing] information

for the purpose of resolving" Chaney's discrimination complaint informally, and has explained

that the statement attributed to Chaney in her Report and voicemail "is not an exact quote."

(Mot. at 29).

> In the employment discrimination context, however,

> Rule 801(d)(2)(D) requires only that the declarant have some authority to speak on matters of hiring or promotion or that the declarant be involved in the decision-making process in general.  This, along with evidence that the statements were made during the existence of the employment relationship and relate to the challenged action, is sufficient to allow the statements into evidence as party admissions.

*Talavera v. Shah*, 638 F.3d 303, 309 (D.C. Cir. 2011) (citation omitted).  Plainly, here, the

challenged statements "were made during the existence of the employment relationship and

relate to the challenged action."  *Id.*  It is also clear that Brezina was not involved in the decision-

making process, as Chaney was the sole decision-maker.  The only remaining question is

therefore whether Brezina had "some authority to speak on matters of hiring or promotion."  *Id.*

The Service cites a declaration from its EEO Director stating that EEO counselors like

Brezina do not "possess the authority to undertake investigations as to whether or not

discrimination occurred" or "to make determinations as to whether or not discrimination

occurred."  (Reply at 10-11) (quoting Ex. 1 thereto (the "McMillon Decl.") ¶¶ 11-12).  But one

need not have such specific kinds of authority in order to have "some authority to speak on

matters of hiring or promotion."  *Talavera*, 638 F.3d at 309.  Rather, the court finds that the

Service's acknowledgment, via this same declaration, that Brezina was authorized "to interview

the complainant and any agency personnel necessary to attempt to resolve the complaint during

the pre-complaint counseling process" suffices to establish that she had the authority necessary

for her Report and voicemail to constitute a party admission under Rule 801(d)(2)(D).  (Reply at

11) (quoting McMillon Decl. ¶ 4).  Brezina was authorized to relay Chaney's explanation for his Unit selections to Ritchie, which is precisely what she did in both her EEO Counseling Report and voicemail.

Moreover, even if the court were to conclude that Brezina's Report and voicemail are not admissible, it would still conclude that Ritchie has proffered direct evidence that would permit a reasonable jury to find that he was the victim of race and gender discrimination in violation of Title VII.  For example, in response to Ritchie's Requests for Admission, the Service explicitly admitted that Chaney considered the racial and gender diversity of applicants when making his selections for the Unit.  (Opp'n Ex. I ("RFA Responses") ¶¶ 1-2; *see also* Mot. at 13 ("Chief Chaney concedes that because of the undercover nature of the [Unit] position he saw value in diversity and considered it as one of several factors in selecting the best candidate.")).  These admissions, on their face, constitute direct evidence linking Ritchie's non-selection for the Unit to the consideration of characteristics protected by Title VII, and therefore suffice to entitle Ritchie to a jury trial on his Title VII claims.[5]

---

[5] The Service argues that in the unique case of undercover law enforcement hiring and assigning, there is a compelling interest in using "diversity-conscious" criteria, and that the use of such criteria is permissible so long as it is narrowly tailored to meet that compelling interest.  (Mot. at 21-26).  But the overwhelming majority of the cases that the Service cites for this proposition are Equal Protection Clause cases, all of which are inapplicable here because Ritchie has not brought an Equal Protection claim, nor could he, given that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment."  *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976); *see also Kizas v. Webster*, 707 F.2d 524, 542 (D.C. Cir. 1983) ("The Title VII remedy declared exclusive for federal employees in *Brown v. GSA* precludes actions against federal officials for alleged constitutional violations as well as actions under other federal legislation.") (citing *Gissen v. Tackman*, 537 F.2d 784 (3d Cir. 1976) (en banc)).

The Service cites only two non-Equal Protection Clause cases for the proposition that, in ruling on a motion to dismiss, courts can use an Equal Protection-like analysis in assessing race-conscious employment decisions under Title VII.  (Mot. at 26).  But these cases are also inapposite here, as they are clearly limited to situations involving remedial affirmative action plans.  *See United Steelworkers of America, AFL-CIO-CLC v. Weber*, 443 U.S. 193 (1979);

The court will also briefly address the Service's argument that Ritchie "is unable to proffer evidence that race or gender were either the determinative factor or a motivating factor in the decision to select individuals other than" him.  (Mot. at 27).  First, the Service notes that Chaney "repeatedly listed the motivating factors that determined the six best candidates and neither race nor gender were on that list."  (*Id.* at 27-28).  This argument ignores the existence of Brezina's Report and voicemail, as well as the RFA Responses discussed above, all of which would permit a reasonable jury to find that race and gender were, in fact, motivating factors behind Chaney's decision.

Second, the Service points to Chaney's assertion that even if Ritchie and the selected candidates' races had been different, it would not have affected his selection.  (*Id.* at 28).  This argument ignores the fact that Ritchie appears, at this juncture of the case, to be pursuing a "pretext" or "single motive" theory – *i.e.*, Ritchie's position appears to be that Chaney is lying when he says that he considered race and gender alongside other factors, and that he instead made his selections decisions solely based on race and sex, as is reflected in Brezina's Report and voicemail.[6]  Only "[i]n a mixed motive case, but not in a single motive case," is it "a partial affirmative defense that the employer would have taken the same action even in the absence of the impermissible motivating factor."  *Ginger v. D.C.*, 527 F.3d 1340, 1345 (D.C. Cir. 2008) (quotations and citations omitted).  Thus, Chaney's assertion that his admitted consideration of

---

*Detroit Police Officers' Ass'n v. Young*, 608 F.2d 671 (6th Cir. 1979), *cert. denied*, 452 U.S. 938 (1981).

[6] The Service itself expressly acknowledges that it understands Ritchie to be pursuing a "pretext" or "single motive" theory when it states that Ritchie argues "that racial and gender-based diversity was not one of several factors considered but was the only factor used for selection" to the Unit.  (Reply at 9).

race and gender did not actually affect his ultimate selections for the Unit cannot not constitute

an affirmative defense here.

> c.   Ritchie Has Not Proffered Sufficient Evidence For A Reasonable
>       Jury To Find That He Was The Victim Of Age Discrimination

As an initial matter, the court finds that Ritchie has established a *prima facie* case of age

discrimination. *See Swierkiewicz*, 534 U.S. at 510. Specifically, Ritchie has established that

(i) he is a member of a protected group (here, the group of persons between the ages of 40 and

70) (Compl. ¶ 12); (ii) "he was a 'very, very strong candidate'" for the Unit (Opp'n at 13);

(iii) he was not selected for the Unit, and his non-selection was an adverse employment action

(*see supra*); and (iv) five of the six people selected for the Unit were not members of the

aforementioned protected group (*see* Opp'n at 9-10). The burden therefore shifts to the Service

"to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."

*McDonnell Douglas*, 411 U.S. at 802.

The court finds that the Service has satisfied its burden under the second step of

*McDonnell Douglas* by proffering evidence indicating that Chaney made his Unit selections on

the basis of (i) certain plainly permissible considerations (Mot. at 7-13; Opp'n at 11-12), as well

as (ii) consideration of race and gender, which, while impermissible under Title VII, are not

barred by the ADEA (Mot. at 13-16; Opp'n at 12, 16 n.6). The court therefore must resolve only

one question: Has Ritchie produced sufficient evidence for a reasonable jury to conclude that the

Service's asserted reasons for his non-selection were not the actual reasons, and that it

intentionally discriminated against him on the basis of his age? *See Smith*, 626 F. Supp. 2d at

88-89. The court agrees with the Service that he has not.

The court reads the references in Brezina's Report and voicemail to "physical[] and

ethnic[] divers[ity]," the Unit's lack of a need for "individuals physically similar to [Ritchie],"

and the like as referring only to Ritchie's race and gender, not to his age.  Ritchie himself appears to take the same view.  (*See*, *e.g.*, Opp'n at 11 ("Chaney provided Brezina with only one reason for Ritchie's non-selection for the [Unit] position; namely, Ritchie's race and gender."); *id.* at 16-17 (arguing that "Ritchie is entitled to a trial on his race and gender discrimination claims on [the] basis [of Brezina's voicemail alone]")).  Accordingly, Brezina's Report and voicemail do not support Ritchie's ADEA claim.

Similarly, while the Service has admitted that Chaney considered the race and gender of applicants when making his Unit selections (*see* RFA Responses ¶¶ 1-2), it has expressly averred "that age was not a factor in the selecting process" (*id.* ¶ 3).  Likewise, while Chaney stated in his deposition that he considered race and gender, he also testified that he did not consider age at all.  (Mot. at 31-32; Reply at 12).

Thus, Ritchie's only evidence in support of his ADEA claim is the fact that all six of the successful Unit applicants were younger than him, with five of them below the age of 40.  That alone is not sufficient evidence for a reasonable jury to find that the Service's asserted reasons for Ritchie's non-selection were not its actual reasons, and that the Service intentionally discriminated against him on the basis of his age.  *See Brady*, 520 F.3d at 494.  The court therefore finds that Ritchie has not proffered sufficient evidence for a reasonable jury to find that he was the victim of age discrimination in violation of the ADEA.

* * *

For the reasons set forth above, the court finds that Ritchie (i) has proffered evidence that would permit a reasonable jury to find that his non-selection for the Unit constituted an adverse employment action; (ii) has proffered admissible direct evidence that would permit a reasonable jury to find that he was the victim of race and gender discrimination; and (iii) has not proffered sufficient evidence for a reasonable jury to find that he was the victim of age discrimination.

The Service's motion for summary judgment is therefore **GRANTED** with regard to Ritchie's

ADEA claim and **DENIED** with regard to Ritchie's two Title VII claims.

### IV.    CONCLUSION

For the reasons set forth above, the Service's motion for summary judgment is hereby

**GRANTED IN PART** and **DENIED IN PART**.

An appropriate Order accompanies this Memorandum Opinion.


Date:  July 11, 2016



*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge